**E-FILED**
Monday, 15 November, 2004  09:26:37 AM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

**FILED**

NOV **1 2** 2004

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

| | |
|---|---|
| GARY L. HEIN, JR., and ELIZABETH J. HEIN,    ) | |
|        ) | |
|        Plaintiffs,    ) | |
|        ) | No. 2004 cv  *22 48* |
|        vs.    ) | |
|        ) | Jury Demanded |
| MERCK & CO., INC., a New Jersey corporation,    ) | |
|        ) | |
|        Defendant.    ) | |

---

## COMPLAINT

---

**NOW COME** the Plaintiffs, Gary L. Hein, Jr., and Elizabeth J. Hein, by Kehart, Peckert &

Booth, their attorneys, and of the Defendant, Merck & Co., Inc., a New Jersey corporation, complain

as follows:

### (Violation of 15 U.S.C. § 78j(b) and 17 C.F.R. 240.10b-5)

1.       The Plaintiffs, Gary L. Hein, Jr., and Elizabeth J. Hein (the "Plaintiffs"), are husband

and wife and are residents of the County of Macon, State of Illinois.

2.       The Defendant, Merck & Co., Inc., a New Jersey corporation ("Merck"), is a

corporation organized and existing pursuant to the laws of the State of New Jersey, and Merck

maintains its principal place of business in the State of New Jersey.

3.       The United States District Court for the Central District of Illinois (the "District

Court") is vested with subject matter jurisdiction of the present action pursuant to 28 U.S.C. § 1331

(federal question), 28 U.S.C. § 1332 (diversity of citizenship) and specific grants of subject matter jurisdiction as set forth herein.

4.     In reference to the District Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship), the citizenship of the Plaintiffs and the citizenship of Merck is completely diverse, and the amount in controversy herein, exclusive of interest and costs, exceeds Seventy-five Thousand Dollars ($75,000.00).

5.     In reference to the District Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), the present matter arises, in part, pursuant to the laws of the United States of America, including the *Securities Act of 1934,* 15 U.S.C. §§ 78(a), *et seq.* (the "Act"), and Rule 10b-5 of the *Rules of the Securities and Exchange Commission,* 17 C.F.R. 240.10b-5 ("Rule 10b-5").

6.     The District Court further is vested with subject matter jurisdiction of the present action pursuant to 28 U.S.C. § 1337(a), because the Act constitutes an Act of Congress regulating commerce.

7.     The District Court further is vested with subject matter jurisdiction of the present action pursuant to § 27 of the Act, 15 U.S.C. § 78aa.

8.     Venue of the present action properly lies before the District Court pursuant to § 27 of the Act, 15 U.S.C. § 78aa, and the provisions of 28 U.S.C. § 1391, because Merck is a corporation and is subject to personal jurisdiction of the courts of the State of Illinois and Merck does repeated and systematic business within the Central District of Illinois.

9.     Merck describes itself as a pharmaceutical products manufacturer which discovers, develops, manufactures and markets a broad range of products for human and animal health. Merck also claims that it is a "global research-driven pharmaceutical company."

-2-

10.    Merck developed, manufactured, and marketed the prescription painkilling drug Vioxx, generically known as rofecoxib.

11.    In May of 1999, after obtaining approval from the Food and Drug Administration, an agency of the Department of Health and Human Services, a department of the United States of America (the "FDA"), to use Vioxx in treating primary dysmenorrhea, managing acute pain in adults, and relieving symptoms relating to osteoarthritis, Merck began vigorous marketing of Vioxx to healthcare providers in the United States by conducting audio conferences, making sales presentations, participating in various media disseminations and issuing press releases.

12.    Beginning by May of 1999, Merck's marketing campaign for Vioxx included misleading statements concerning the safety profile of Vioxx, together with statements describing the claimed superiority of Vioxx to a rival drug marketed under the name, Celebrex, by Pfizer, Inc., a Delaware corporation ("Pfizer"). On or about November 16, 1999, the FDA provided Merck with written correspondence, wherein the FDA stated that the "promotional pieces [utilized by Merck for the marketing of Vioxx] are false and misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims and are lacking in fair balance."

13.    On December 16, 1999, following a review of Merck's responses to the FDA's November 1999 letter, the FDA sent a letter to Merck, concluding that Merck's promotional pieces were false and misleading and violated the law. The letter read, in relevant part, as follows:

> Reference is made to [Merck] letters, dated November 30, 1999 and December 15, 1999, in response to letters from the Division of Drug Marketing, Advertising, and Communications (DDMAC) dated , November 12, 1999, and December 1, 1999. Our letters concerned the alleged dissemination of two "homemade" promotional pieces, entitled "TEN REASONS WHY VIOXX IS BETTER THAN

-3-

CELEBREX," and "Vioxx vs. Celebrex Poem" distributed by or on behalf of Merck, that promoted Vioxx (rofecoxib) capsule in violation of the Federal Food, Drug and Cosmetic Act (Act) and its regulations....

\* \* \*

We have received these promotional pieces and have determined that they are false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance.

Misrepresentation of Safety Information
You present claims that misrepresent the safety profile of Vioxx, including but not limited to "VIOXX HAS ENDOSCOPY SUTDIES SHOWING A SAFER THAN PLACEBO INCIDENCE RATE OF GASTRODUODENAL ULCERS." However, this claim is in direct contrast with the approved product labeling (PI) that states, "...the studies cannot rule out at least some increase in the rate of endoscopic gastroduodenal ulcers when comparing Vioxx to placebo."...

Unsubstantiated Comparative Claims

\*\*\*

In the Vioxx vs. Celebrex Poem you claim, "Your patients in pain – they give you their grief; A Cox-II is the answer for their pain relief." ...However, this global superiority claim has not been demonstrated by substantial evidence, and therefore, is false, and misleading...

You also present several unsubstantiated comparative claims to Celebrex (celecoxib), including but not limited to, "Vioxx of course – the answer again, It's stronger, lasts longer, is faster, and then it's safer..."

Fair Balance

\*\*\*

Although these pieces contain numerous claims for the efficacy and safety of Vioxx, you have not presented any risk information concerning the contradictions, warnings, precautions, or adverse

-4-

> events associated with Vioxx's use. Therefore, we consider these promotional pieces to be lacking in fair balance. Further, these promotional pieces are in violation of the Act because the approved product labeling for Vioxx did not accompany them.

14.    On January 26, 2000, Merck issued a press release announcing its financial results for the fourth quarter of, and full year ending, December 31, 1999. For the year, Merck reported revenue of $32.7 billion, as compared with revenues of $26.9 billion in the prior year. An authorized officer of Merck also commented as follows:

> Sales growth for the quarter and the year was led by the established products, the newer products, including Vioxx, as well as growth from the Merck-Medco Managed Care business.

15.    Merck's financial results for the full year of 1999, *i.e.,* the period ending December 31, 1999, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about March 22, 2000, which read, in pertinent part, as follows:

> In May 1999, the [FDA] cleared Vioxx, a once-daily, anti-inflammatory COX-2 specific inhibitor, for marketing in the United States for relief of the signs and symptoms of osteoarthritis, management of acute pain in adults, and treatment of menstrual pain. Vioxx had now been launched in 47 other countries in addition to the United States. In March 1999, the FDA approved a new use indication for Mevacor....
>
> In May 1999, following a six-month priority review, the FDA cleared Vioxx, Merck's once-daily agent that specifically inhibits COX-2, for relief of the signs and symptoms of osteoarthritis, management of acute pain in adults and treatment of menstrual pain. With its product relief profile for strength, safety and once daily simplicity, Vioxx remains the country's fastest growing prescription arthritis medicine. In the product's first seven months, U.S. physicians wrote more than five million prescriptions. Vioxx is also enjoying success in the 47

-5-

> other countries in which it has been launched. Vioxx was the first agent that specifically inhibits COX-2 to receive mutual recognition approval for marketing in all of the European Union countries and quickly became the most successful pharmaceutical launch in the United Kingdom after its introduction. In September 1999, Merck entered into an agreement with a leader in dental products to copromote Vioxx to U.S. dentists, periodontists, and oral surgeons. The company is conducting extensive clinical studies with Vioxx to evaluate its efficacy in the treatment of rheumatoid arthritis and in the prevention and treatment of Alzheimer's disease. Merck also has begun studies in patients with colon polyps – a broad population at risk of developing colon cancer. Reducing the number of these polyps may reduce the incidence of colon cancer.

16.    Prior to March of 2000, Merck sponsored a certain study called the Vioxx Gastrointestinal Outcomes Research (the "VIGOR study"), and Merck released the results thereof in March of 2000, wherein Merck stated, in part, that the VIGOR study demonstrated "significantly few heart attacks were observed in patients taking naproxen (0.1 percent) compared to the group taking Vioxx (0.5 percent) in this study. There was no difference in cardiovascular mortality between the group treated with Vioxx or naproxen." In or about May of 2000, Merck submitted these results to the FDA.

17.    On April 24, 2000, Merck issued a press release announcing its financial results for the first quarter of 2000, *i.e.,* the period ending March 31, 2000. For the quarter, Merck reported revenues of $8.9 billion, as compared with revenues of $7.5 billion for the same quarter in the prior year. An authorized officer of Merck also commented, as follows:

> Income growth for the quarter was driven by strong sales volume gains as well as manufacturing productivity improvements. . . . The savings from productivity improvements helped fund selling and promotion programs to support our new products as well as research and development.

-6-

18.     Merck's financial results for the first quarter of 2000, *i.e.,* the period ending March

31, 2000, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May

12, 2000, which read, in pertinent part, as follows:

> Sales growth for the quarter was led by Vioxx, the fastest growing
> prescription arthritis medicine in the United States, other newer and
> established products and growth form the Merck-Medco Managed
> Care business. Overall, worldwide operations reported strong sales
> volume gains. Sales of Merck human health products increased 17%
> for the first quarter. Sales of Merck human health products outside
> of the United States accounted for 37% of Merck human health sales.
> Foreign exchange had essentially no effect on the human health sales
> growth for the first quarter. Income growth for the quarter was driven
> by strong sales volume gains as well as manufacturing productivity
> improvements. The savings from productivity improvements helped
> fund selling and promotion programs to support new products as well
> as research and development. Five key products – Vioxx, 'Zocar',
> 'Fosamax', 'Singulair' and Cozaar'/'Hyzaar' – led Merck's growth,
> and now account for more than 50% of AstraZeneca LP also
> contributed to sales volume growth.  Vioxx remains the fastest
> growing prescription arthritis medicine in the United States. More
> than 9 million prescriptions have been written for Vioxx since its
> U.S. introduction 10 months ago. In addition, it is the only medicine
> specifically inhibiting COX-2 that is indicated both for treatment of
> osteoarthritis and for relief of acute pain, such as pain following knee,
> hip replacement and dental surgery. Vioxx is enjoying strong success
> in the European countries where it has been launched, including the
> United Kingdom, Germany and Spain.  In all, Vioxx has been
> launched in more than 50 countries. Merck is conducting extensive
> clinical studies with Vioxx to evaluate its efficacy in the treatment of
> rheumatoid arthritis and in the prevention and treatment of
> Alzheimer's disease. Merck has also begun studies to investigate
> whether Vioxx can reduce the number of colon polyps in patients
> who suffer from them – a broad population at risk of developing
> colon cancer.

19.     On July 24, 2000, Merck issued a press release announcing its financial results for

the second quarter of 2000, *i.e.,* the period ending June 30, 2000. For the quarter, Merck reported

revenues of $9.5 billion, as compared with revenues of $8 billion for the same quarter in the prior

year. An authorized officer of Merck also stated, as follows:

> Sales growth for the quarter and the first half of 2000 was led by
> Vioxx, the other newer and established products and growth from
> the Merck-Medco Managed Care business . . . . Strong volume
> gains in both the domestic and international operations contributed
> to the second quarter results.

20.    Merck's financial results for the second quarter of 2000, *i.e.,* the period ending June

30, 2000, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about

August 10, 2000, which read, in pertinent part, as follows:

> Vioxx, Merck's newest medicine for osteoarthritis and acute pain,
> has been launched in nearly 70 countries, including the United
> States, the United Kingdom, Germany, Spain, Mexico, Sweden, and
> Denmark. It remains the world's fastest growing prescription
> arthritis medicine, with more than 12 million prescriptions written
> since it was first introduced last year. In addition, Vioxx is the only
> medicine specifically inhibiting COX-2 that is indicated in the
> United States both for treatment of osteoarthritis and for relief of
> acute pain.
>
> In May, Merck presented results from the 8,000 patient Vioxx
> Gastrointestinal Outcomes Research (VIGOR) study in which Vioxx
> reduced the incidence of serious gastrointestinal side effects, such
> as ulcers and bleeding, by more than 50 percent compared to the
> nonsteroidal, anti-anti-inflammatory drug, Naproxen. In June,
> Merck submitted a Supplemental New Drug Application for Vioxx
> to the U.S. Food and Drug Administration (FDA) to request labeling
> changes based on that study.
>
> To expand the market for Vioxx, Merck continues clinical trials to
> determine whether Vioxx is effective in the treatment of rheumatoid
> arthritis and in the prevention and treatment of Alzheimer's disease.
> Merck has also begun studies to investigate whether Vioxx can

> reduce the number of colon polyps in patients who suffer from them
> – a broad population of developing colon cancer.

21.    On or about October 20, 2000, Merck issued a press release announcing its financial results for the third quarter of 2000, the period ending September 30, 2000. For the quarter, Merck reported revenues of $10.56 billion, as compared with $8.20 billion for the same quarter in the prior year. An authorized representative of Merck commented as follows:

> Income growth for the quarter and first nine months reflect strong sales volume gains in the U.S. and international markets, as well as manufacturing productivity improvements .... These gains helped fund research and development and promotion programs in support of our key products.

22.    Merck's financial results for the third quarter of 2000, *i.e.,* the period ending September 30, 2000, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about November 13, 2000, which read, in pertinent part, as follows:

> The Company's newest medicine, 'Vioxx', together with 'Zocor', 'Cozaar'/'Hyzaar', 'Fosamax', and 'Singulair' are driving Merck's strong performance. These products accounted for 55% of Merck's worldwide human health sales for the first nine months.
>
> More than 15 million prescriptions in the United States alone have been written for 'Vioxx,' Merck's new medicine for osteoarthritis, since its successful launch last year, and it continues as the world's fastest growing prescription arthritis medicine. 'Vioxx' has now achieved nearly $1.5 billion in sales so far this year – more than $600 million in this quarter alone. A key reason for its success is that 'Vioxx' is the only COX-2 inhibitor approved by the FDA both for osteoarthritis and acute pain.
>
> A pilot study in osteoarthritis comparing 'Vioxx' and celecoxib, a competitive product, presented at the European League Against

Rheumatism in June, showed that 'Vioxx' reduced osteoarthritis pain at night and at rest to a greater degree than either celecoxib 200 mg or acetaminophen 4,000 mg.

In June, Merck submitted a Supplemental New Drug Application for 'Vioxx' to the FDA to request labeling changes based on the results of the 8,000 patient 'Vioxx' Gastrointestinal Outcomes Research (VIGOR) study. In this study, 'Vioxx' reduced the incidence of serious gastrointestinal side effects, such as ulcers and bleeding, by more than 50% compared to the nonsteroidal anti-inflammatory drug naproxen.

Clinical programs are underway to explore other potential benefits for 'Vioxx,' including the treatment of chronic pain, rheumatoid arthritis and in the prevention and treatment of Alzheimer's disease. Merck has also begun studies to investigate whether 'Vioxx' can reduce the number of colon polyps in patients who suffer from them – a broad population at risk of developing colon cancer.

23.     On January 23, 2001, Merck issued a press release announcing its financial results

for the fourth quarter of 2000 and full year of 2000, *i.e.*, the periods ending December 31, 2000,

Merck reported revenues of $40.4 billion, as compared with revenues of $32.7 billion for the prior

year. An authorized representative of Merck stated that:

Income growth for the quarter and the year reflects strong worldwide sales volume gains, as well as manufacturing productivity improvements .... These gains helped fund our ongoing research and development programs and promotional campaigns in support of our key products.

24.     On or about February 2001, Merck communicated with the public via Merck's

internet website, as part of its 2000 annual report, an article entitled "Vioxx: World's Fastest-

Growing Rx Osteoarthritis Medicine in 2000" in which Merack stated, in relevant part, as follows:

-10-

In less than two years on the market, Vioxx has become the world's fastest-growing branded prescription drug for osteoarthritis and acute pain and Merck's second largest-selling medicine. Global sales are running at an annual rate of more than $2 billion, bringing it level with the other entry in the COX-2 field, despite a later start in the United States, the world's largest market. Our drug already accounts for about half of all new COX-2 prescriptions written in the United States.

Non selective nonsteroidal anti-inflammatory drugs (NSAIDs) such as ibuprofen and naproxen are associated with serious gastrointestinal (GI) side effects in some patients. In November 2000, the New England Journal of Medicine published the results of VIGOR, our 8,000-patient study, which showed that Vioxx reduced the risk of serious GI complications by half when compared with the NSAID naproxen. The Food and Drug Administration Arthritis Advisory Committee recommended in 2001 that the study's results, as well as data on certain cardiovascular events, should be included in the labeling. The FDA is not obligated to follow the advice of the Advisory Committee.

Although the VIGOR study was a GI outcomes study and was not designed to show difference in cardiovascular effects, significantly fewer heart attacks were observed in patients talking naproxen (0.1 percent) in this study. There was a difference in cardiovascular mortality between the group treated with Vioxx or naproxen.

Further growth prospects exist in potential new uses for Vioxx.

25.     On April 20, 2001, Merck issued a press release announcing its financial results for the first quarter of 2001, *i.e.,* the period ending March 31, 2001. For the Quarter, Merck reported revenues of $11.3 billion, as compared with revenues of $8.9 billion for the same quarter in the prior year. An authorized officer of Merck commented that:

Income growth for the quarter reflects strong worldwide sales volume gains led by our five key growth drivers - ZOCOR, Vioxx, COZAAR/HYZAAR, FOSAMAX and SINGULAIR - which combined had increased sales of 30% over first quarter 2000 sales.

-11-

26.    Merck's financial results for the first quarter of 2001, *i.e.*, the period ending March

31, 2001, were repeated in the Company's quarterly report on Form 10-Q filed with the SEC on or

about May 10, 2001, which read, in pertinent part, as follows:

> Vioxx, a once-a-day medicine, is the only COX-2 selective agent
> indicated in the United States for both osteoarthritis and acute pain.
> Since its successful 1999 launch, Vioxx has become the world's
> fastest-growing branded prescription arthritis medicine, and it is
> already Merck's second largest selling medicine. Vioxx achieved
> $485 billion in sales for the first quarter 2001.
>
> Earlier this month, Merck received an approvable letter from the
> FDA regarding the Company's application for changes to
> prescribing information for Vioxx based on results from the Vioxx
> Gastrointestinal Outcomes Research (VIGOR) study.    An
> approvable letter is defined by the FDA as a written statement that
> the FDA will approve the application if specific additional
> information of material is submitted or specific conditions are met.
> An approvable letter does not constitute approval of the application.
> Approval letters may result in additional time for completion of the
> FDA review.

27.    On May 22, 2001, the Merck confirmed the safety cardiovascular profile of Vioxx

in light of the VIGOR study.  On the same date, an article appearing on PR Newswire stated, in

relevant part, as follows: "[i]n response to news and analyst reports of data [Merck] first released

a year ago, [Merck] today reconfirmed the favorable cardiovascular safety profile of Vioxx®."

28.    On July 20, 2001, Merck issued a press release announcing its financial results for

the second quarter of 2001, *i.e.*, the period ending June 30, 2001. For the quarter, Merck reported

revenues of $11.9 billion, as compared with revenues of $9.5 billion for the same quarter in the

prior year. On behalf of Merck, an authorized officer stated that:

-12-

> Income growth for the first six months reflects strong worldwide
> sales volume gains led by our five key growth drivers [ZOCOR,
> Vioxx, COZAAR/HYZAAR, FOSAMAX and SINGULAIR], which
> combined increased 28% over the first six months 2000 sales.

29.    Merck's financial results for the second quarter of 2001, *i.e.,* the period ending June

30, 2001, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about

August 10, 2001, which read, in pertinent part, as follows:

> Merck's human health sales were driven by its five key growth
> drivers - Zocor, Vioxx, Cozaar and Hyzaar, Fosamax, and Singulair.
> . . .
>
> Vioxx, a once-a-day medicine, is the only COX-2 selective agent
> indicated in the United States for both osteoarthritis and acute pain.
> Since its 1999 launch, Vioxx has become the world's fastest
> growing branded prescription arthritis medicine, and it is already
> Merck's second largest-selling medicine. In 2001, Vioxx achieved
> new prescription leadership within the coxib market in the United
> States, demonstrating that physicians continue to recognize the
> medicine's benefits to patients. Vioxx achieved $725 million in the
> sales for the second quarter.
>
> New scientific data supporting the efficacy and overall safety profile
> of Vioxx were presented at medical meetings during the quarter.
> These data included the results of the ADVANTAGE trial,
> presented at the Digestive Diseases Week conference in May. In
> this study, fewer patients on Vioxx stopped taking their medicine
> because of gastrointestinal side effects compared to patients taking
> naproxen, a commonly prescribed non-steroidal, anti-inflammatory
> drug.
>
> In April 2001, Merck filed a Supplemental New Drug Application
> for Vioxx with the FDA for the treatment of rheumatoid arthritis.

-13-

30.    On August 22, 2001, following the announcement of the result of the Merck-

sponsored VIGOR study of Vioxx, *The Journal of the American Medical Association* published an

article authored by three physicians entitled, "Risk of Cardiovascular Events Associated With

Selective COX-2 Inhibitors," which read, in relevant part, as follows:

> Our search yielded 2 major randomized trials, the Vioxx
> Gastrointestinal Outcomes Research Study (VIGOR; 8076 patients)
> and the Celecoxib Long-term Arthritis Safety Study (CLASS' 8059
> patients), as well as 2 smaller trials with approximately 1000
> patients each. The results from VIGOR showed that the relative risk
> of developing a confirmed adjudicated thrombotic cardiovascular
> event (Myocardial infarction, unstable angina, cardiac thrombus,
> resuscitated cardiac arrest, sudden or unexplained death, ischemic
> stroke, and transient ischemic attacks) . . . . The annualized
> myocardial infarction rates for COX-2 inhibitors in both VIGOR
> and CLASS were significantly higher than that in the placebo group
> of a recent met-analysis of 23,407 patients . . . .
>
> The available data raise a cautionary flag about the risk of
> cardiovascular events with COX-2 inhibitors. Further prospective
> trial evaluation may characterize and determine the magnitute of the
> risk.

31.    On September 17, 2001, the FDA sent the FDA Warning Letter to Merck

concerning the Company's marketing of Vioxx. In the FDA Warning Letter, the FDA stated, in

relevant part:

> This warning letter concerns [Merck]'s promotional activities and
> material for the marketing of Vioxx (rofecoxib) tablets.
> Specifically, we refer to promotional audio conferences given on
> behalf of Merck by Peter Holt, M.D., a press release, and oral
> representations made by Merck sales representatives to promote
> Vioxx. As part of its routine monitoring and surveillance program,
> the Division of Drug Marketing, Advertising, and Communications
> (DDMAC) has reviewed your promotional activities and materials

-14-

and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal, Food, Drug, and Cosmetic Act (The Act) and applicable regulations. See 21 U.S.C. §§ 331 (a) and (b), 352(a), (f), and (n), and 355(a).

You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the [VIGOR] study, and thus, misrepresents the safety profile for Vioxx. Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients, on Vioxx were observed to have four to five fold increase in the myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (naproxen).

Although the exact reason for the increased rate of MIs observed in the Vioxx treatment group is unknown, your promotional campaign selectively presents the following hypothetical explanation for the observed increase in MIs. You assert that Vioxx does not increase the risk of MIs and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties.

You have also engaged in promotional activities that minimize the Vioxx/Coumadin (warfarin) drug interaction, omit important risk information, make unsubstantial superiority claims against other NSAIDs, and promote Vioxx for unapproved uses and unapproved dosing regimen. In addition, in misrepresenting the Vioxx/warfarin drug interaction you also misrepresent Vioxx's safety profile by minimizing the potentially serious risk of significant bleeding that can result from using Vioxx and warfarin concomitantly.

\* \* \*

Promotional Audio Conferences
We are aware of six promotional audio conferences, presented on behalf of Merck by Peter Hold, MD that are in violation of the Act and its implementing regulation . . . .

\* \* \*

-15-

The promotional audio conferences . . . were false or misleading in that they minimized the MI results of the VIGOR study, minimizes the Vioxx/Coumadin drug interaction, omitted important risk information, made unsubstantiated superiority claims, and promoted Vioxx for unapproved uses and unapproved dosing regimen.

\* \* \*

Press Release

We have identified a Merck press release entitled "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above. Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen. The implication that Vioxx's cardiovascular profile is superior to other NSAIDs misleading; in fact, serious cardiovascular events were twice as frequent in the VIOXX treatment group (101 events, 2.5%) as in the naproxen treatment group (46 events, 1.1%) in the VIGOR study.

Oral Representations

Merck sales representatives have engaged in false or misleading promotional actitives that also minimize the potentially serious MI results observed in the VIGOR trial. Specifically Merck sales representatives made false or misleading statements to DDMAC reviewers at two different professional meetings. At your exhibit booth during the 119th Annual Meeting of the Maryland Pharmacists Association (MphA), in Ocean City, Maryland, June 9 - June 12, 2001, your representative stated that the increased MI rate seen in patients on Vioxx in the VIGOR study is due to the fact that naproxen works just like aspirin (i.e., inhibits clotting and plately aggregation). In addition, during the Annual Meeting of the American Society of Health - Systems Pharmacists (ASHP), in Los Angeles, California, June 3 - June 6, 2001, your representatives stated that Vioxx had a greater MI rate in the VIGOR trial because naproxen is cardioprotective, having platelet effects similar to aspirin. These statements made by your sales representatives are misleading for the reasons stated above.

-16-

32.    On October 18, 2001, Merck issued a press release announcing its financial results

for the third quarter of 2001, *i.e.,* the period ending September 30, 2001. For the quarter, Merck

reported revenues of $11.9 billion, as compared with revenues of $10.6 billion for the same quarter

in the prior year. On behalf of Merck, an authorized officer stated that:

> Our five key growth drivers [ZOCAR, VIOXX,
> COZAAR/HYZAAR, FOSAMAX and SINGULAIR], which had
> increased sales of nearly 30% over the first nine months of 2000 and
> now account for two-thirds of Merck's worldwide human health
> sales, continued to lead Merck's income growth.

33.    Merck's financial results for the third quarter of 2001, *i.e.,* the period ending

September 30, 2001, were repeated in the Company's Report on Form 10-Q filed with the SEC on

or about November 13, 2001, which read, in pertinent part:

> Vioxx, a once-a-day medicine, is the only COX-2 selective agent
> approved in the United States for both osteoarthritis and acute pain.
> Available in more than 70 countries, Vioxx is Merck's second
> largest-selling medicine. In the third quarter, Vioxx continued new
> prescription leadership within the coxib market in the United States
> and in many European and Latin American countries.    Vioxx
> became the first and only coxib approved for acute pain in a
> European Union country when it launched with that indication in the
> Untied Kingdom in September 2001. In the third quarter, Vioxx
> achieved $795 million in sales, an increase of 29% over the same
> quarter last year.
>
> In a continuing worldwide dispute between Merck and Pharmacia
> Corporation (Pharmacia) over competing claims to the patent rights
> to the class of compounds that include rofecoxib, the active
> ingredient in Vioxx, the federal district court in Washington D.C.,
> recently dismissed a Pharmacia claim for damages for Merck's sale
> of Vioxx. Pharmacia may seek an appeal of this decision. Merck
> has also received favorable decisions regarding the patent status of
> Vioxx from courts in the U.K., Holland and Spain, while receiving

-17-

> no adverse claims in any country. The Company also noted that a number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx. Some of the lawsuits also name as defendants Pfizer Inc. and Pharmacia, which market a competing product, Celebrex. The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend them.

34.    On January 22, 2002, Merck issued a press release announcing its financial results

for the full year of 2001, *i.e.,* the period ending December 31, 2001. For the year, Merck reported

revenues of $47.7 billion, as compared with revenues of $40.4 billion in the prior year. On behalf

of Merck, an authorized officer stated that:

> Our five key growth drivers, which also are our five largest products, now account for 68% of Merck's worldwide human health sales and continue to lead Merck's income growth. These medicines are true breakthroughs - they offer novel approaches to disease treatment, help large, underserved patient populations and are effective, well-tolerated and convenient. The market-growth potential for these medicines remains strong.

35.    Merck's financial results for the full year of 2001, *i.e.,* the period ending December

31, 2001, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about

March 21, 2002, which read, in pertinent part, as follows:

> The Company also noted that a number of federal and states lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx. Some of the lawsuit also name as defendants Pfizer Inc. and Pharmacia, which market a competing product. The lawsuits include allegations regarding gastrointestinal bleeding and

-18-

> cardiovascular events. The Company believes that these lawsuits
> are completely without merit and will vigorously defend them.

36.    On April 18, 2002, Merck issued a press release announcing its financial results for

the first quarter of 2002, *i.e.,* the period ending March 31, 2002. For the quarter, Merck reported

revenues of $12.2 billion, as compared with revenues of $11.3 billion for the same quarter in the

prior year. The press release also discussed Merck's previously-announced filing of a registration

statement with the SEC for an initial public offering of a Merck-related company, and an authorized

Merck officer and representative commented as follows:

> The separation of Merck-Medco will allow Merck to focus more
> fully on its priorities of turning cutting-edge science into
> breakthrough medicines and supporting them through targeted and
> well executed marketing .... With the continued growth of our five
> key franchises - ZOCAR, Vioxx, COZAAR/HYZAAR,
> FOSAMAX, and SINGULAIR - along with our plans to file or
> launch 11 new medicines by 2006, we expect the core
> pharmaceutical business to deliver double digit earnings per share
> growth in 2003 and top-tier performance over the longer term.

37.    Merck's financial results for the first quarter of 2002, *i.e.,* the period ending March

31, 2002, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about

May 13, 2002, which read, in pertinent part, the following:

> Vioxx, the Company's second-largest-selling medicine, continues
> to gain acceptance among physicians and patients worldwide.
> Global sales for the quarter were $650 million. In April 2002,
> Merck announced that the FDA has approved changes to the
> prescribing information for Vioxx, under the gastrointestinal (GI)
> warning section, to include results from the landmark Vioxx
> Gastrointestinal Outcomes Research (the VIGOR) study. The FDA
> also approved Vioxx 25 mg for the relief of the signs of rheumatoid

-19-

arthritis in adults. Vioxx is now the first and only medicine that selectively inhibits the COX-2 enzyme that is proving to reduce the risk of developing clinically important GI side effects in patients with or without the risk factors for such GI side effects compared to the nonsteroidal anti-inflammatory drug (NSAID) naproxen. In this study, the number of patients with serious cardiovascular thrombotic events in the group treated with Vioxx 50 mg was higher than in the group taking naproxin. In a placebo-controlled database derived from two other studies, the number of patients with serious cardiovascular thrombotic events among those receiving Vioxx 25 mg was 21 compared to 35 for patients taking placebo. In these two-placebo control studies, mortality due to cardiovascular thrombotic events was 8 versus 3 for Vioxx versus placebo, respectively. These data also are reflected in the prescribing information. The significance of the cardiovascular findings from these three studies (VIGOR and the placebo-controlled studies) is unknown.

In addition, new data presented at the American Academy of Pain Management meeting in the first quarter showed a single dose of Vioxx 50 mg providing superior pain relief over six hours compared to the narcotic oxycodone 5 mg/acetaminophen 325 mg in patients with moderate to severe pain following dental surgery. Vioxx remains the only medicine that selectively inhibits Cox-2 to offer once-daily 24-hour relief for osteoarthritis, rheumatoid arthritis, and acute pain.

38.    Merck's financial results for the second quarter 2002, *i.e.*, the period ending June 30, 2002, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about August 13, 2002, which read, in pertinent part, the following:

> Global sales of 'Vioxx', the Company's second-largest selling of medicine, were $845 million this quarter, an increase of 17% over the 2001 second quarter. On a year-to-date basis, Vioxx totaled $1.5 billion, an increase of 24% over the first half of 2001. Wholesaler buying patterns favorably impacted second quarter and year-to-date sales by approximately $155 billion and $115 million, respectively. In April, the FDA approved changes to the prescribing information to include results from the landmark 'Vioxx' Gastrointestinal

-20-

>Outcomes Research (VIG0R) study and a new indication with 'Vioxx' 25 mg for the relief of the signs and symptoms of rheumatoid arthritis in adults. 'Vioxx' now is the only Cox-2 specific inhibitor with a label demonstrating the proven risk reductions in clinically important gastrointestinal events compared to the non-asteroidal anti-inflammatory drug (NSAID) naproxin and the only Cox-2 specific inhibitor to offer once-daily 24-hour relief for osteoarthritis, rheumatoid arthritis and acute pain.

39. Merck's financial results for the third-quarter 2002, *i.e.,* the period ending September 30, 2002, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about November 13, 2002, which read, in pertinent part, the following:

>Vioxx, the Company's second-largest selling medicine, achieved $755 million in worldwide sales in the third quarter, an increase of 3% over the 2001 third quarter. On a year-to-date basis, Vioxx sales totaled $2.1 billion, an increase in 17% over the first nine months of 2001. While wholesaler buying patterns favorably impacted third quarter and year-to-date sales by approximately $133 million and $238 million, respectively, the Company expects that wholesaler buying patterns will have an unfavorable impact in the fourth quarter. Full-year 2002 to sales of "Vioxx" and "Arcoxia", which is described below, are expected to approximate $2.6 to $2.8 billion. Gastrointestinal (GI) safety remains an important consideration when physicians are choosing a medication for the treatment of arthritis. Since the GI outcomes data from the landmark 8000-patient Vioxx Gastrointestinal Outcomes Research (VIGOR) study were added to the labeling for Vioxx, the number of key managed care accounts with Vioxx in an advantage position among coxibs continues to grow. More than 20 million people now have exclusive or preferred access to Vioxx through their managed care plans.

>In acute dental pain studies, Vioxx has demonstrated superior efficacy to codeine 60 mg with acetaminophen 600 mg as well as oxycodone 5 mg with acetaminophen 325 mg. Outside the United States, Vioxx maintains its leadership position as the most widely prescribed COX-

2 inhibitor in Latin America, Canada and Europe, where it is the coxib with the broadest range of indications, including acute pain.

40.    Merck's financial results for the annual report 2002 were repeated in the Company's

report on Form 10-Q filed with the SEC on or about March 21, 2003, which read, in pertinent part,

as follows:

Vioxx, Merck's once-a-day coxib, remains the largest and most prescribed arthritis pain medication across many markets worldwide, including Europe, Canada and Latin America. For the year, Vioxx sales grew 8% over 2001, achieving at $2.5 billion in sales. Excluding the estimated impact of wholesaler buying patterns, the year-on-year growth of Vioxx approximated 1%.    In 2003, worldwide sales of coxibx, Vioxx and Arcoxia, are expected to approximate $2.6 billion to $2.8 billion..

Pain relief and gastrointestinal (GI) safety remain important consideration when physicians are choosing a medication for the treatment of arthritis.    Since the GI outcomes data from the landmark 8000-patient Vioxx Gastrointestinal Outcomes Research (VIGOR) study were added to the labeling for Vioxx, the number of key managed care accounts with Vioxx in an advantaged position among coxibs continues to grow. More than 35 million people now have exclusive or preferred access to Vioxx through their managed care plans.

An updated analysis combining data from 20 clinical trials for more than 17,000 arthritis patients was presented at the American College of Rheumatology in the fourth quarter of 2002 and underscores the proven GI safety profile of Vioxx. This new data showed that Vioxx significantly reduced by 62% the incidence of confirmed upper-GI perforations, ulcers and bleeds compared to four widely used non-selective non-steroidal antiinflammatory drugs (NSAIDs). The analysis is consistent with the significant reduction of clinically important GI events versus naproxen seen in the VIGOR study.

Also in clinical studies in acute pain, Vioxx has demonstrated superior efficacy to codeine 60 mg with acetaminophen 600 mg as well as oxycodone 5mg with acetaminophen 325 milligrams.

-22-

. . . A number of federal and state lawsuits, involving individual claims as well as purported class actions, have been filed against the Company with respect to Vioxx. Some of the lawsuits also named as defendants Pfizer Inc. and Pharmacia, which market a competing product. The lawsuits include allegations regarding gastrointestinal bleeding and cardiovascular events. The Company believes that these lawsuits are completely without merit and will vigorously defend against them.

41.     Merck's financial results for the first-quarter 2003, *i.e.,* the period ending March 31, 2003, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 14, 2003, which read, in pertinent part, as follows:

Merck's once-a-day coxib, Vioxx, has been launched in 77 countries worldwide. In the United States, Vioxx is the most widely prescribed frequently preferred coxib on managed care formularies. Vioxx is the leading coxib outside the United States. Global sales for the quarter were $527 million, 12% lower than the first quarter of 2002. Wholesaler buying patterns unfavorably impacted the quarter by approximately $70 million. In 2003, worldwide sales of coxibs, "Vioxx" and "Arcoxia", which is discussed below, are expected to approximate $2.6 to $2.8 billion.

42.     Merck's financial results for the second quarter of 2003, *i.e.,* the period ending June 30, 2003, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about August 13, 2003, which read, in pertinent part, as follows:

Worldwide sales of Merck's first once-a-day coxib, Vioxx, were $801 million during the second quarter, representing a 1% increase compared to the 2002 same peiord. In the United States, Vioxx is most widely prescribed and frequently preferred coxib on managed care formularies. Vioxx is also the leading coxib outside the United States. Mail-order-adjusted prescription levels in United States for Vioxx decreased by approximately 7% for the quarter. In June, the Company increased the price of Vioxx in the United States. In the

aggregate, estimated wholesaler buy-in for Vioxx had a favorable impact of $160 million for the quarter. This is expected to have an unfavorable impact on wholesaler price purchases for Vioxx in the remaining quarters of 2003. Estimated wholesaler inventory levels for Vioxx remained within a range customary for Merck products. In 2003, worldwide sales of coxibs, "Vioxx" and "Arcoxia", which is discussed below, are expected to approximate $2.5 to $2.7 billion.

Data presented at the 55th Annual Scientific Meeting of the American Academy of Neurology in April profile research results for Vioxx in the treatment of acute migraine headaches. Vioxx 25 mg once daily and 50 mg once daily relieved acute migraine pain within two hours and reduced certain symptoms associated with migraine headaches of moderate to severe intensity. Vioxx was well-tolerated compared to placebo in this 557-patient study.

43.     The above-referenced statements, together with later statements provided by Merck, were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others: (a) that Merck's claims that Vioxx was superior to other pain relieving drugs, including Celebrex, were untrue when made; (b) that Vioxx's safety profile was inaccurate; (c) that Merck's campaign to sell Vioxx, upon which commercial success of the product was dependent, included materially false and misleading statements about the cardiovascular events of taking Vioxx; (d) that the FDA had twice issued warning letters to Merck concluding that its promotional materials were false and misleading, lacking in fair balance, and unsubstantiated; (e) that the risk of cardiovascular events increased significantly among patients taking Vioxx compared to those who took Celebrex or nothing at all; and (e) that medical studies, including studies sponsored by Merck, demonstrated safety concerns with Vioxx and/or evidence of lack of efficacy.

-24-

44.    Merck failed and refused to disclose to the public, including members of the public investing in securities issued by Merck and/or sold upon various stock exchanges, including the Plaintiffs, that use of Vioxx included a significantly increased risk of myocardial infarctions in patients using Vioxx or that Merck had received Warning letters form the FDA in reference to the marketing of Vioxx.

45.    In the August 2001 issue of *The Journal of the American Medical Association*, an article concerning the VIGOR study reiterated the necessity that "a cautionary flag" be raised concerning the risk of cardiovascular problems caused by taking Vioxx. Moreover, in September of 2001, the FDA issued to Merck a warning letter (the "FDA Warning Letter"), concerning Merck's marketing of Vioxx, wherein the FDA stated that Merck minimized the potentially serious risk of increased heart problems discovered in the VIGOR study and downplayed the adverse effect of using Vioxx with the drug Coumadin. In the FDA Warning Letter, the FDA stated that Merck's marketing of Vioxx was "false, lacking in fair balance, or otherwise misleading[.]" In the FDA Warning Letter, the FDA continued to state that Merck's marketing and promotional efforts for Vioxx "minimized the potentially serious cardiovascular findings that were observed in the VIGOR study, minimize the Vioxx/Coumadin drug interaction, omit[ted] crucial risk information associated with Vioxx therapy, contain[ed] unsubstantiated comparative claims, and promote[d] unapproved uses."

46.    Despite available information, Merck, contending that the FDA Warning Letter and other studies were inaccurate and/or inconclusive, failed to disclose adequately the degree and nature of the serious adverse risks of Vioxx, but rather continued Merck's marketing and promotional efforts to sell Vioxx and receive the revenues derived from said sales.

-25-

47.     During this time period, Merck remained motivated to conceal the extent of the adverse risks of taking Vioxx in order to compete with other drug companies, including Pfizer, and Pfizer's competing product, Celebrex. Merck further was motivated to boost sales of Vioxx, because Merck was facing the expiration of the patent on one of its best revenue-generating drugs, Zocor, and did not have other drugs (with the sales potential of Zocor and Vioxx) in the pipeline to serve as a replacement for Zocor. Moreover, Merck had not participated in the common practice of the industry to partner with other drug companies and biotechnology companies to obtain license rights to blockbuster drugs in order to promote cost-savings measures and expand Merck's research and development.

48.     As a direct result of the failure and refusal by Merck to disclose the potentially adverse health effects of taking Vioxx and the risks associated with continued sales, promotion and marketing of Vioxx, the prices for Merck equity securities during this time period were artificially inflated, which artificial inflation was known, or should have been known to Merck.

49.     Moments prior to the close of the New York Stock Exchange (the "NYSE") on October 22, 2003, *Reuters* published an article reporting Merck's third quarter 2003 financial results, entitled "Merck to Cut 4,400 Jobs, Earnings Flat," in which article the adverse health risks associated with taking Vioxx (which were discovered in the VIGOR study) were confirmed. Said *Reuters* article stated that the "arthritis drug is suffering from clinical trial data suggesting it might slightly raise the risk of heart attacks, and the growing perception that its pain-fighting capabilities are not better that traditional painkillers."

50.     Upon dissemination of the October 22, 2003 *Reuters* article (described in the immediately preceding paragraph hereof), the announced price for a share of Merck common stock

-26-

on October 23, 2003 on the NYSE was as low as $44.85, a reduction of $2.05 from the previous day's (*i.e.,* October 22, 2004) trading high, and the announced price of a share of Merck's common stock closed on te NYSE at $45.10.

51. On October 30, 2003, *The Wall Street Journal* (the "WSJ") explained the adverse health risks associated with Vioxx in an article entitled "Vioxx Study Sees Heart-Attack Risk." The WSJ article reported that the results of another Merck-sponsored study, presented at the annual meeting of the American College of Rheumatology, demonstrated an "increased risk of heart attacks in patients taking the pill [Vioxx]." Further, this WSJ article stated that within the first 30 days of taking Vioxx, the risk of a heart attack was increased by 39% in comparison with Celebrex. This was a significant increase from the 0.5% discovered in the VIGOR study which compared Vioxx to naproxen, a nonsteroidal anti-inflammatory drug ("NSAID"). Said WSJ article read, in pertinent part, as follows:

> Brigham and Women's Hospital rheumatologist and epidemiologist Daniel H. Solomon headed the study, which look at records of 54,475 Medicare patients, all of them over 65.
>
> Researchers found that the apparent cardiac risk was greatest in the first 90 days in which a patient is taking Vioxx, which generically is known as rofecoxib. In the first 30 days, the researchers found, Vioxx was linked to a 39% increase heart-attack risk compared with Celebrex. Between 30 and 90 days, that increased relative risk was 37% ...
>
> Eric J. Topol, chairman of cardiovascular medicine at Cleveland Clinic and one of the authors who first raised the issue two years ago, called the research "the best study to date."

* * *

-27-

> The new study, Dr. Topol said, "greatly substantiates our concerns about the cardiac side effects." He observed that the possible cardiac effects of Vioxx appear "worse with the higher doses."

On the same day, the WSJ published an article entitled, "Merc's slide may dislodge company CEO" which read, in relevant part, as follows:

> Last week, the usually low-profile chief executive began to exhibit a sense of urgency. He announced he was laying off 5% of Merck's 63,000 employees and tried to reach out to investors, answering questions on a quarterly earnings conference call and appearing on CNBC. But that didn't stop the company's stock price from falling 6.5% on the day of the announcement.

> Ms. Ryan, the Deutsche Bank analyst, wonders why he kept repeating a forecast for double-digit profit growth this year until abandoning it last week. "You'd have to be crazy at this point to believe their guidance," she said. Merck's 2003 net income is expected to fall for the second straight year.

The market's reaction to the news was swift and dramatic. On this news, the NYSE price per share of Merck common stock fell $0.97, or 2.1%, from its previous day's closing price, to close at $43.56.

52.    Merck continued to disseminate information to the public contesting and disputing the findings and reports of adverse health effects from taking Vioxx, and Merck failed to report to the public the concerns expressed by the FDA and other concerns known by Merck of potential adverse health risks associated with Vioxx.

53.    After repeatedly contesting the information and suggestions of adverse health risks associated with Vioxx use by patients, on September 30, 2004, Merck announced its decision to withdraw, on a worldwide basis, Vioxx from further sales, and Merck acknowledged that available

-28-

data supported the conclusion that Vioxx use increased the risk of cardiovascular events, including myocardial infarctions, for patients taking Vioxx for a period of 18 months (as compared to placebo use).

54. Following this disclosure by Merck, the per share price of Merck's common stock fell precipitously on massive trading, with a decline on September 30, 2004 from (approximately) $45.00 to (approximately) $35.00. Thereafter, following continued disclosures and reporting of knowledge and information held by Merck of the adverse health risks associated with Vioxx, Merck's common stock continued to decline and closed (on the NYSE) on November 9, 2004 at $26.00.

55. On or about November 9, 2004, Merck also disclosed publicly that the United States Department of Justice, a department of the United States of America (the "DOJ") was conducting a criminal investigation of Merck's handling of Vioxx, research therefor and marketing thereof. In addition to the DOJ investigation, Merck also disclosed publicly that the SEC had commenced an informal inquiry into Merck's handling of the Vioxx issue.

56. The Plaintiffs purchased and acquired shares of Merck common stock on the following dates, with a corresponding number of shares purchased on said dates and the dollar value of the purchases:

| Date | Number of Shares | Dollar Purchase Amount |
|------|------------------|------------------------|
| January 28, 2002 | 2,265 | 129,042.05 |
| February 4, 2002 | 590 | 34,719.24 |
| March 13, 2002 | 1,350 | 86,774.31 |
| September 4, 2002 | 1,000 | 48,849.02 |
| October 3, 2002 | 1,890 | 89,267.17 |

-29-

| February 2, 2004 | 3,100 | 148,879.00 |
| August 18, 2004 | 1,100 | 49,974.85 |
| TOTALS | 11,295 | 587,505.64 |

57.  Had the Plaintiffs possessed the knowledge and information possessed presently by them, of the adverse health effects of Vioxx and the exposure to massive liabilities presently being experienced by Merck, the Plaintiff would not have purchased and/or acquired shares of Merck's common stock.

58.  In connection with the acts alleged in this Complaint, Merck, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire communications and the facilities of the national securities markets.

59.  Among other securities issued by Merck, the common stock thereof is registered with the United States Securities and Exchange Commission (the "SEC"), and said common stock is regularly and systematically traded on various stock exchanges, including the NYSE.

60.  As alleged herein, Merck, through its authorized officers and representatives acted with scienter in that Merck: (a) knew that the public documents and statements issued or disseminated in Merck's name were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

61.  At all relevant times, the market for Merck's securities was an efficient market for the following reasons, among others: (a) Merck's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market; (b) as a regulated

-30-

issuer, Merck filed periodic public reports with the SEC and the NYSE; (c) Merck regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with financial press and other similar reporting services; and (d) Merck was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

62.     As a result of the foregoing, the market for Merck's securities promptly digested current information regarding Merck from all publicly available sources and reflected such information in Merck's stock price.

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved

-31-

by an executive officer of Merck who knew (or should have known) that those statements were false when made.

64. The statements made by Merck, which were intended and known by Merck to be disseminated to public investors, constituted deception in contravention of the rules and regulations of the SEC, and were false or misleading due to their content or omissions therefrom.

65. During the time period of which the Plaintiffs complain herein, Merck carried out a plan, scheme and course of conduct which was intended to and, throughout said time period, did: (a) deceive the investing public, including the Plaintiffs, as alleged herein; (b) artificially inflate and maintain the market price of Merck's securities, including shares of Merck's common stock; and (c) cause the Plaintiff to purchase Merck's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Merck participated in the activities alleged herein.

66. Merck: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Merck's securities in violation of Section 10(b) of the Act and Rule 10b-5 of the SEC's rules.

67. In addition to the duties of full disclosure imposed on Merck as a result of making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Merck had a duty to disseminate promptly truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC's

rules and regulations, including accurate and truthful information with respect to Merck's operations, financial condition and earnings so that the market price of Merck's securities would be based on truthful, complete and accurate information.

68.    Merck, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Merck as specified herein.

69.    During the time period alleged herein, and while in possession of material adverse non-public information, Merck employed devices, schemes and artifices to defraud public investors, including the Plaintiffs, in Merck's effort to assure investors of Merck's purported value, performance and continuing substantial growth.  Said devices, schemes and artifices included making and disseminating untrue statements of material facts and omitting to state necessary material facts in order to avoid the misleading effect of Merck's statements about its business operations and future prospects.

70.    Merck had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that Merck failed to ascertain and to disclose such facts, even though such facts were available to Merck.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Merck's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Merck's overstatements and misstatements of Merck's business, operations and earnings throughout the time period alleged herein, Merck, if it did not have actual knowledge of the misrepresentations and

omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Merck's securities was artificially inflated during the time period alleged herein.

72.    Without knowing that the market prices of Merck's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Merck, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Merck but not disclosed in public statements by Merck, the Plaintiffs purchased and acquired Merck securities at artificially high prices and were damaged thereby.

**WHEREFORE**, the Plaintiffs, Gary L. Hein, Jr., and Elizabeth J. Hein, pray that the United States District Court for the Central District of Illinois enter judgment in their favor and against the Defendant, Merck & Co., Inc., a New Jersey corporation, in an amount that will fairly and fully compensate the Plaintiffs for the losses and damages suffered thereby, including interest thereon, as may be proved at trial herein, but not to exceed Five Hundred Eighty-seven Thousand Five Hundred Five Dollars and Sixty-four Cents ($587,505.64), plus interest, together with such costs, expenses and fees, including reasonable attorney's fees necessarily incurred herein by the Plaintiffs, and such other and further relief as deemed just and appropriate.

Dated: November 12, 2004                    Gary L. Hein, Jr., and Elizabeth J. Hein, Plaintiffs,

BY: _James E. Kehart_

Of          Kehart, Peckert & Booth

                              Their Attorneys

## JURY DEMAND

The Plaintiffs, Gary L. Hein, Jr., and Elizabeth J. Hein, hereby demand a trial by a jury of

all issues herein so triable.

Dated: November 12, 2004                    Gary L. Hein, Jr., and Elizabeth J. Hein, Plaintiffs,

BY: _James E. Kehart_

Of          Kehart, Peckert & Booth

                              Their Attorneys

James E. Peckert
Kehart, Peckert & Booth
132 South Water Street, Suite 200
Post Office Box 860
Decatur, Illinois 62525-0860
Telephone:     (217) 428-4689
Facsimile:     (217) 422-7850
E-Mail:        jep@kehart.com

-35-

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS – 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Gary L. Hew, JR., and
Elizabeth J. Hew

## DEFENDANTS

Merck & Co, INC., a New Jersey Corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Macon
(EXCEPT IN U.S. PLAINTIFF CASES)

toto

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT_____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
OF LAND INVOLVED

**(C)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kehart, peckert + Booth
132 Water, Suite 200
Decatur, IL        (217) 428-4689

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a
Party)

☐ 2 U.S. Government
Defendant

☑ 4 Diversity
(Indicate Citizenship of
Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND
(For Diversity Cases Only)                                ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 690 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN        (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 another district
(specify)

Transferred from

☐ 6 Multidistrict
Litigation

Appeal to District
Judge from
☐ Magistrate
Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 USC §78j(b) and 17 C.F.R. 240.10b-5

## VII. REQUESTED IN
COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**
$587,505.64

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ YES   ☐ NO

## VIII. RELATED CASE(S)
IF ANY            (See instructions):

JUDGE _____        DOCKET NUMBER _____

DATE  11/12/04

SIGNATURE OF ATTORNEY OF RECORD
Bill Schille for James Peckert